**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C.
Steven N. Serajeddini, P.C. (*pro hac vice* pending)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

-and-

John R. Luze (*pro hac vice* pending)
300 North LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

**COOLEY LLP**
Cullen D. Speckhart (VSB 79096)
*Admitted to practice in New York, Virginia, Missouri and Texas; Not admitted to practice in DC, supervised by members of DC bar*
Olya Antle (VSB 83153)
*Admitted to practice in Virginia; Not admitted to practice in DC, supervised by members of DC bar*
1299 Pennsylvania Avenue, NW, Suite 700
Washington, DC 20004-2400
Telephone: (202) 842-7800
Facsimile: (202) 842-7899

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ASCENA RETAIL GROUP, INC., *et al.*,[1] | ) | Case No. 20-33113 (KRH) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |

**DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO (A) PAY PREPETITION WAGES, SALARIES, OTHER COMPENSATION, AND REIMBURSABLE EXPENSES AND (B) CONTINUE EMPLOYEE BENEFITS PROGRAMS, AND (II) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "Debtors")[2] respectfully state as follows in support of this motion (this "Motion"):

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at http://cases.primeclerk.com/ascena. The location of Debtor Ascena Retail Group, Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 933 MacArthur Boulevard, Mahwah, New Jersey 07430

[2] On July 23, 2020 (the "Petition Date"), each Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). A detailed description of the Debtors, their business, and the facts and circumstances supporting these chapter 11 cases is set forth in the *Declaration of Carrie W. Teffner, Interim Executive Chair of Ascena Retail Group, Inc., in Support of Chapter 11 Petitions and First Day Motions*

**Relief Requested**

1. The Debtors seek entry of interim and final orders, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B** (the "Interim Order" and the "Final Order," respectively) (a) authorizing the Debtors to (i) pay all prepetition and postpetition wages, salaries, reimbursable expenses, and other obligations on account of the Employee Compensation and Benefits Programs (as defined below) in the ordinary course of business, and (ii) continue to administer the Employee Compensation and Benefits Programs in the ordinary course of business, and (b) granting related relief. In addition, the Debtors request that the Court schedule a final hearing 21 days after the commencement of these chapter 11 cases to consider approval of this Motion on a final basis.

**Jurisdiction and Venue**

2. The United States Bankruptcy Court for the Eastern District of Virginia (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Standing Order of Reference from the United States District Court for the Eastern District of Virginia*, dated August 15, 1984. The Debtors confirm their consent, pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

3. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

---

(the "First Day Declaration"), filed contemporaneously herewith. Capitalized terms used but not defined herein shall have the meanings given to them in the First Day Declaration.

4. The bases for the relief requested herein are sections 105(a), 362(d), 363(b), and 507(a) of the Bankruptcy Code, Bankruptcy Rules 6003 and 6004, and Rule 9013-1 of the Local Rules of the United States Bankruptcy Court for the Eastern District of Virginia (the "Local Bankruptcy Rules").

**Response to COVID-19**

5. Due to the unprecedented and unforeseen disruption to the Debtors' business caused by COVID-19, the Debtors made the incredibly difficult decision to implement temporary salary reductions and both partial and full furloughs that will affect nearly all of the Debtors' employees (the "Furlough Program"). On March 15, 2020, the Debtors began restricting their entire store fleet to minimum hours and staffing. On March 18, 2020, the Debtors voluntarily closed their entire store fleet to protect the safety of their employees, customers, and vendors and to accommodate a rising number of government-mandated "shelter-in-place" orders. Accordingly, beginning March 29, 2020 through June 5, 2020, the Debtors placed approximately 39,153 full- and part-time employees on temporary furlough (the "Furloughed Employees").[3] Beginning on March 29, 2020, the Debtors reduced the salaries of all non-furloughed exempt employees, and, on April 1, 2020, reduced the salaries of all associates paid on a semi-monthly basis, as the Debtors continued to monitor ongoing developments concerning COVID-19 and related governmental actions (the "Furlough Period"). During the Furlough Period, Furloughed Employees were permitted to use up to twenty hours of paid-time off per week through May 9, 2020, or in locations where local law prohibited the restriction of paid-time off, after which the employees remained on unpaid leave unless otherwise scheduled to work.

[3] This Motion is not intended to serve as a notice to the Furloughed Employees of their furlough or employment status. Employees were sent detailed notice of their employment status prior to the Petition Date.

6. As of March 29, 2020, the Debtors retained approximately 4,105 active employees necessary for maintaining the Debtors' limited business operations, which gradually increased to 18,569 as of June 7, 2020 (the "Active Employees"), as the Debtors returned employees from furlough in light of lifted COVID-19 restrictions and safer conditions. Additionally, effective on June 14, 2020, the Debtors approved the restoration of non-insider employee base salaries that were subject to a temporary reduction as a result of the COVID-19 pandemic and later approved the restoration of insider base salaries on June 21, 2020.

7. Accordingly, in order to return operations to increased capacity during these chapter 11 cases, the Debtors seek authority, as applicable and as described more fully herein, to continue ordinary course Compensation and Benefits Programs (as defined herein) on a postpetition basis in the ordinary course of business.

**The Debtors' Workforce**

8. The Debtors employ over 9,442 individuals on a full-time basis and 27,393 individuals on a part-time basis (the "Employees") in the United States. Approximately 33,832 Employees are paid on an hourly basis, and approximately 3,003 Employees earn a salary. Approximately ten Employees at one store location are members of a labor force union (the "Union Employees").[4] In addition to the Employees, the Debtors periodically retain specialized individuals as independent contractors, as well as temporary workers paid through third-party administrators, to complete discrete projects (the "Temporary Staff") sourced regularly from various staffing agencies (the "Staffing Agencies") to fulfill certain duties on a short- and

[4] The Union Employees are members of the Local 338 Chapter of the Retail Wholesale Department Store Union/United Food and Commercial Workers International Union (the "Union"). The Union Employees work at a store in Green Acres, Valley Stream, New York. The Debtors are party to a collective bargaining agreement with the Union ("Collective Bargaining Agreement").

long-term basis. At this time, the Debtors retain approximately 600 Temporary Staff. The Temporary Staff is an important supplement to the efforts of the Debtors' Employees.

9. The Debtors' Employees and Temporary Staff perform a wide variety of functions critical to the Debtors' operations at the Debtors' home office, distribution centers, and stores. Certain of these individuals are highly trained and have an essential working knowledge of the Debtors' business that cannot be easily replaced. The remainder of these individuals provide services necessary to continue the Debtors' store-level operations. Without the continued, uninterrupted services of their Employees and Temporary Staff, the Debtors' reorganization efforts will be threatened.

**Employee Compensation and Benefits Programs**

10. The Debtors maintain the following compensation and benefits programs and pay various administrative fees and premiums in connection therewith (each as defined herein, and together, the "Employee Compensation and Benefits Programs"):

- Employee Compensation;
- Temporary Staff Compensation;
- Payroll Processing Fees;
- Withholding Obligations;
- Reimbursable Expenses;
- Charitable Donation Programs;
- Relocation Expenses;
- Employee Discounts;
- Non-Insider Employee Incentive and Retention Programs;
- Health and Welfare Programs;
- Retirement Plans;

- Assistance Programs;
- Paid Time Off, Paid Leave and Unpaid Leave;
- Non-Insider Severance Program; and
- Director Compensation.

11. Further description of these programs and the prepetition amounts owing, if any, on account of such programs is provided below. The vast majority of Employees rely exclusively on the Employee Compensation and Benefits Programs to pay their daily living expenses and support their families. Thus, Employees will face significant financial consequences if the Debtors are not permitted to continue the Employee Compensation and Benefits Programs in the ordinary course of business. Consequently, the relief requested is necessary and appropriate.

12. Subject to the Court's approval, the Debtors intend to continue their Employee Compensation and Benefits Programs in the ordinary course. The Debtors further request confirmation of their right to modify, change, and discontinue any of their Employee Compensation and Benefits Programs and to implement new programs, policies, and benefits in the ordinary course of business during these chapter 11 cases in their discretion and without the need for further court approval, subject to other orders entered in these chapter 11 cases, any agreements executed in contemplation of these chapter 11 cases, and the requirements of the Bankruptcy Code.

13. The Debtors do not believe that amounts owed to any Employees on account of the Employee Compensation Benefits will exceed the statutory cap of $13,650 under sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code. For the avoidance of doubt, the Debtors do not seek authority to pay any amounts per Employee in excess of the statutory cap of $13,650 pursuant to the Interim Order. The Debtors do, however, seek authority to pay amounts in excess of $13,650 solely pursuant to the Final Order, in the event that it is determined that payment of certain

prepetition amounts owed on account of Employee Compensation and Benefits are in excess of $13,650.

## I. Compensation, Employee Administration Providers, and Withholding Obligations.

### A. Unpaid Wages.

14. The Debtors pay Employees' wages, salaries, and other compensation (excluding reimbursable expenses, non-insider Employee incentive programs, non-insider severance programs, and paid leave) on a bi-weekly basis (collectively, the "Employee Compensation"). Approximately 36,835 Employees are paid on a bi-weekly basis. Because Employees are generally paid in arrears, certain Employees will be owed accrued but unpaid Employee Compensation as of the Petition Date. Employee Compensation may also be due and owing as of the Petition Date because of, among other things, potential discrepancies between the amounts paid and the amounts that Employees believe they should have been paid, which, upon resolution, may reveal that additional amounts are owed to such Employees, or as result of Employees holding uncashed paper paychecks as of the Petition Date. In the twelve months before the Petition Date, the Debtors spent an average of approximately $67.2 million per month on Employee Compensation.

15. As of the Petition Date, the Debtors estimate that the amount of accrued but unpaid obligations owed to Employees is approximately $20 million on account of accrued Employee Compensation earned before the Petition Date, all of which is expected to come due during the first 21 days of these chapter 11 cases (the "Interim Period"). The Debtors do not believe that amounts owed to any Employees on account of Employee Compensation will exceed the statutory cap of $13,650 under sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code.

**B. Temporary Staff Compensation.**

16. The Debtors make payments to Staffing Agencies on account of certain Temporary Staff (the "Temporary Staff Compensation") for the performance of certain services critical to the Debtors' operations, including, among other things, administrative functions, such as information technology and maintenance services, and operational functions related to the Debtors' retail businesses. The Debtors rely on the support of Temporary Staff to complete discrete projects in furtherance of the Debtors' businesses and to fill short-term, sometimes seasonal positions that are not economically feasible to employ on a full- or part-time basis. The Debtors believe the authority to continue paying the Staffing Agencies is critical to minimize disruption of the Debtors' continued business operations.

17. In the twelve months before the Petition Date, the Debtors spent approximately $52 million on Temporary Staff and staffing agencies in the aggregate, excluding temporary associates who were otherwise part of the Debtors payroll processing. As of the Petition Date, the Debtors estimate that Temporary Staff are owed an aggregate of approximately $3.5 million on account of accrued services rendered prior to the Petition Date. The Debtors do not believe they owe any Temporary Staff amounts in excess of $13,650.

**C. Employee Administration Providers.**

18. The Debtors work with several providers that provide, among other things, workforce evaluation and data analytics, background checks, employee outplacing, and recordkeeping systems and services. The service providers include Equifax Workforce Solutions ("Equifax"), Gallup, Inc. ("Gallup"), Right Management Talent Solutions ("Right Management"), Sterling, and LawLogix (collectively, the "Employee Administration Providers"). The relationships with the Employee Administration Providers allow the Debtors' human resource professionals to manage a large, global workforce in an efficient and cost-effective manner. The

inability to use the systems and services provided by the Employee Administration Providers would impose significant costs on the Debtors and impair the human resource professionals' ability to perform their normal duties.

19. As of the Petition Date, the Debtors estimate they owe approximately $521,889 in the aggregate to the Employee Administration Providers, $107,782 of which is due during the Interim Period. The Debtors intend to continue to use the Employee Administration Providers during these chapter 11 cases and seek authorization, but not direction, to pay all outstanding prepetition amounts due to the Employee Administration Providers, to continue to make all payments in the ordinary course of business on a postpetition basis.

**D. Payroll Processing.**

20. The Debtors retain and pay processing fees to ADP, LLP ("ADP"), Workday, Inc. ("Workday"), and JDA Software Group, Inc. ("JDA," and, together with ADP and Workday, such fees, the "Payroll Processing Fees") to administer payroll. While ADP provides the payroll processing system and electronic timesheet management for hourly Employees for most of the Debtors' employees, Workday provides the necessary human resources information to ADP to, among other things, administer payroll processing, and ensure proper tax withholding, other than Employees at ANN Inc. brand stores who use JDA to manage their timesheets. In the twelve months before the Petition Date, the Debtors paid administration fees to ADP in the amount of approximately $2.0 million. As of the Petition Date, the Debtors estimate that the amount of accrued but unpaid obligations owed on account of administration fees is approximately $202,000 to ADP, approximately $48,000 to Workday, and approximately $59,000 to JDA, all of which will come due and owing within the Interim Period.

**E. Withholding Obligations.**

21. During each applicable pay period, the Debtors routinely deduct certain amounts from Employees' paychecks, including, without limitation, garnishments, levies, child support and related fees, and pre-tax deductions payable pursuant to certain of the Health and Welfare Programs (as defined below), such as an Employee's share of healthcare benefits and insurance premiums, 401(k) contributions, legally ordered deductions, union dues (and other amounts deducted on account of Union Employees, and miscellaneous deductions, such as employee-elected charitable contributions, collectively, the "Deductions"), and forward such amounts to various third-party recipients. In the twelve months before the Petition Date, average monthly Deductions were approximately $4.5 million. The Debtors estimate that as of the Petition Date, they are currently holding approximately $560,000 in such Deductions.

22. The Debtors also are required by law to withhold from the Employees' Compensation amounts related to, among other things, federal, state, local income taxes, and Social Security and Medicare taxes (collectively, the "Employee Payroll Taxes") for remittance to the appropriate federal, state, and local taxing authorities. The Debtors must then match the Employee Payroll Taxes from their own funds and pay, based upon a percentage of gross payroll, additional amounts for state and federal unemployment insurance (the "Employer Payroll Taxes" and, together with the Employee Payroll Taxes, the "Payroll Taxes").[5] The majority of Payroll Taxes are generally processed and forwarded to the appropriate federal, state, or local taxing authority within a few days of when Employees' payroll checks are disbursed. In the

[5] In light of COVID-19 federal relief provided under the CARES Act, the Debtors have elected to defer paying the employer portion of contributions under the Federal Insurance Contributions Act on account of accrued Social Security and Medicare Taxes. These amounts have been deferred beginning on April 1, 2020, and will be remitted in the 2021 and 2022 taxable years.

twelve months before the Petition Date, average monthly Payroll Taxes were approximately $21 million.

23. As of the Petition Date, the Debtors estimate that the aggregate amount of accrued but unpaid Deductions and Payroll Taxes (together, the "Withholding Obligations") is approximately $11 million, all of which will come due within the Interim Period. By this Motion, the Debtors seek authority, but not direction, to pay or deduct a manner consistent with historical practice any unpaid Withholding Obligations and to continue to honor the Withholding Obligations in the ordinary course of the Debtors' business on a postpetition basis.

**F. Reimbursable Expenses.**

24. The Debtors reimburse certain Employees and members of the board of directors for certain expenses incurred in the scope of their duties (the "Reimbursable Expenses"). Reimbursable Expenses typically include expenses associated with transportation, lodging, and meals incurred in connection with business travel and certain other work-related expenses. The Debtors provide Employees with five different ways they may pay Reimbursable Expenses, four of which require reimbursement directly to Employees. The Debtors' inability to reimburse such expenses would impose hardship on such individuals where the obligations were incurred for the Debtors' benefit. By this Motion, the Debtors seek authority to continue and pay amounts relating to Reimbursable Expenses, including unpaid amounts owed to Employees and directors on account of Reimbursable Expenses incurred through their Personal Funds (as defined below), the Corporate Credit Cards (as defined below), the Business Vehicle Reimbursement Plan (as defined below), the Business Travel Account (as defined below), and the Educational Reimbursements (as defined below).

**1. Personal Funds.**

25. Eligible Employees and directors may elect to use their personal credit cards or cash (collectively, the "Personal Funds") and seek reimbursement from the Debtors for Reimbursable Expenses. Because these expenses are incurred through the use of Personal Funds, the Employee or director is personally liable for any unpaid obligations. The Debtors' inability to reimburse such expenses would impose a hardship on such individuals where the obligations were incurred for the Debtors' benefit.

26. In the ordinary course of business, Employees submit their expenses online through third-party administrators, provided by the Oracle Corporation ("Oracle") and SAP Travel Management ("SAP"). The Debtors then process reimbursement requests and pay the Employee for the approved expense. Oracle and SAP greatly reduce the administrative expense that would otherwise fall on the Debtors related to the prompt payment of Reimbursement Expenses. The Debtors pay approximately $40,000 per month for Oracle and SAP's services.

27. In the twelve months before the Petition Date, the Debtors spent approximately $52,000 per month on account of Reimbursable Expenses incurred through the use of Employees' Personal Funds. As of the Petition Date, the Debtors do not believe there are any Reimbursable Expenses amounts outstanding on account of the Employee Personal Funds; however, for the avoidance of doubt, the Debtors seek to maintain the Personal Funds reimbursement program in the ordinary course of business.

**2. Corporate Credit Cards.**

28. The Debtors also provide certain Employees with corporate credit cards (the "Corporate Credit Cards"). The Corporate Credit Cards are issued to Employees in each Employee's own name and monthly invoices are sent to the Employee's personal attention. Employees are personally liable on account of the Corporate Credit Card and must make payments

in a timely manner. As of March 2020, in light of the COVID-19 pandemic, all Corporate Credit Cards were suspended.

29. In the twelve months before the Petition Date, the average monthly amount paid on account of the Corporate Credit Cards was approximately $2.8 million. As of the Petition Date, the Debtors do not believe there are any unpaid amounts outstanding on account of the Corporate Credit Cards. However, as COVID-19 restrictions continue to be lifted and the Debtors begin to re-open stores, the Debtors request the authority to continue utilizing and making payments on account of the Corporate Credit Cards as may they come due in the ordinary course of business.

**3. Business Vehicle Reimbursement Plan.**

30. The Debtors maintain a business vehicle reimbursement plan administered by MOTUS LLC ("MOTUS," and, such reimbursement plan, the "Business Vehicle Reimbursement Plan"). As of the Petition Date, 223 Employees participate in the Business Vehicle Reimbursement Plan. An Employee is eligible for mileage reimbursement under the Business Vehicle Reimbursement Plan if that Employee is required to provide a personal vehicle at work each day extensively as part of their role and meets certain mileage amounts. Under the Business Vehicle Reimbursement Plan, the Debtors reimburse eligible Employees at the start of the applicable year following a 60-day invoicing notice period. The Debtors' average annual cost of the Business Vehicle Reimbursement Plan varies across its brands. The Debtors' average costs are approximately $30,484.30 per month for the Ann Taylor brand and stores, $8,313.48 for the Ascena corporate brand, $10,760.00 for Catherines, $24,356.54 for Lane Bryant, and $24,799.39 for the Tween brands. As of the Petition Date, the Debtors estimate that the aggregate amount of accrued but unpaid amounts owed on account of the Business Vehicle Reimbursement Plan is approximately $21,750.24.

**4. Business Travel Account.**

31. The Debtors also maintain a business travel account (the "Business Travel Account"). Employees book air, hotel, and rental cars that are initially billed to the Allstars Travels Group ("ATG"), processed and billed to Employees through the Corporate Credit Cards or Personal Funds, and reimbursed through ADP along with the Employees regular pay, with the exception of Ann Taylor brand employees, who instead process business travel expenses through SAP Travel Management ("SAP") and are reimbursed through accounts payable in a separate deposit.

32. In the twelve months before the Petition Date, the average monthly amount paid on account of the Business Travel Account was approximately $698,511. As of the Petition Date, the Debtors do not believe any amounts are outstanding on account of the Business Travel Account. Accordingly, the Debtors seek the authority, but not direction, to maintain the Business Travel Account.

**5. Educational Reimbursements.**

33. In the ordinary course of business, the Debtors provide educational assistance payments to certain Employees (the "Educational Reimbursements"). The specifics of each Educational Reimbursements program varies based on brand and location. However, as a general matter, to be eligible, the Employee must pursue education related to the Employee's job or career path and maintain a grade average of a C or higher. Educational Reimbursements may also be limited to certain amounts, such as a $3,000 annually, depending on the specific brand and location. The Debtors pay approximately $47,748.67 on an annual basis on account of the Educational Reimbursements. As of the Petition Date, the Debtors do not believe any amounts are outstanding on account of the Educational Reimbursements. Accordingly, the Debtors seek the authority, but not direction, to maintain the Educational Reimbursements.

**G. Charitable Donation Programs.**

34. In the ordinary course of business, the Debtors encourage their Employees to support their colleagues and communities through several charitable donation programs (the "Charitable Donation Programs"). In particular, Employees may elect to have certain charitable contributions to sponsored non-profit organizations, Girls on the Run and Nationwide Children's Hospital, withheld from their paychecks. Employees may also elect to have certain contributions withheld from their paychecks and distributed to the Dimes from the Heart associate program, a non-profit emergency assistance fund for all associates, funded entirely by Employees. Eligible associates can then apply for a grant from the Dimes from the Heart program during a time of need, including home catastrophe, disaster, care of a family member, domestic violence, emergency travel, funeral expenses, or victim of a crime. On an average annual basis, the Debtors withhold approximately $37,825.22 in contributions on account of the Charitable Donation Programs. As of the Petition Date, the Debtors do not believe they owe any amounts on account of the Charitable Donation Programs. By this Motion, the Debtors seek authority to continue the Charitable Donation Programs in the ordinary course of business.

**H. Relocation Expenses.**

35. In the ordinary course of business, the Debtors also pay certain expenses of Employees that are transferred in connection with their job (the "Relocation Expenses"). The majority of Relocation Expenses are either reimbursed to the Employees or directly billed to the Debtors by SIRVA Relocation and Moving Services ("SIRVA"), the Debtors' relocation provider. The Relocation Expenses include, but are not limited to, costs associated with the transportation of household goods, lease cancellation expenses, certain tax assistance, eligible home sale and purchase closing cost expenses, temporary living accommodations, and other covered expenses. The amount of Relocation Expenses depends on the applicable Employee's level and the

complexity of the relocation. Currently, there are no Employees who are in the process of transferring in connection with their job.

36. On an annual basis, the Debtors spend on average approximately $2.1 million on account of Relocation Expenses. As of the Petition Date, the Debtors do not believe there are any amounts outstanding on account of the Relocation Expenses; however, for the avoidance of doubt, the Debtors seek to maintain the Relocation Expenses program in the ordinary course of business.

**I. Employee Discounts.**

37. Employees are entitled to discounted merchandise in the Debtors' various stores and websites at discounted rates of twenty percent through fifty percent depending on the applicable brand or store (the "Employee Discounts"). The Employee Discounts are taken at the point of sale, so the Debtors are not liable for any amounts on account of the Employee Discounts. Out of an abundance of caution, the Debtors request the authority, but not direction, to continue the Employee Discounts in the ordinary course of business.

**II. Non-Insider Employee Incentive and Retention Programs.**

38. The Debtors maintain several incentive and retention programs to motivate, reward, and retain certain of their non-insider Employees, each as described in greater detail below (collectively, the "Non-Insider Employee Incentive and Retention Programs").[6] Certain non-Insider Employees, including Union Employees, are eligible to participate in various performance-based incentive programs, including the Store Management Bonus Programs, the District Managers Bonus Programs, the Distribution Center Bonus Programs, the Non-Insider Quarterly Incentive Program, the 2020 Guaranteed Incentive Compensation Program, Non-Insider

[6] The relief sought under this Motion with respect to the Non-Insider Employee Incentive Programs does not include the payment of any obligation to an "insider" (as that term is defined in section 101(31) of the Bankruptcy Code, the "Insiders"). The Debtors will seek separate authority with respect to such parties and reserve all rights with respect to the "insider" status of such parties.

Retention Bonus Program, and pay certain administrative fees to third-party providers associated with such programs (each as defined herein, and, collectively, the "Performance Incentive Programs"). Awards under the Performance Incentive Programs are distributed entirely at the discretion of the Company and are calculated and paid in cash, up to the maximum incentive payment for each Employee, based on the specific performance metrics under the applicable program, as further described below.

39. The Debtors believe the Performance Incentive Programs are integral to the Debtors' business operations. In particular, the Performance Incentive Programs align Employees' interests with those of the Debtors generally by linking payments under the Performance Incentive Programs to performance and overall efficiency of the Debtors' operations. As of the Petition Date, the Debtors estimate that the aggregate amount of accrued but unpaid amounts owed on account of the Performance Incentive Plans is approximately $7.7 million.

40. By this Motion, the Debtors seek authority to pay all amounts due but not yet paid on account of the Performance Incentive Programs (the "Performance Incentive Programs Obligations") pursuant to the Final Order and to continue, supplement, or modify the Programs Performance Incentive Programs in the ordinary course of business on a postpetition basis.

**A. Store Management Bonus Programs.**

41. Various levels of management across each of the Debtors' brands and stores have the opportunity to earn bonuses up to a certain amount annually, depending on the Employee's specific title under the store management bonus plan (the "Store Management Bonus Programs"). Bonuses thereunder are awarded monthly or seasonally, depending on the specific brand and store, and are based on whether the Employee's specific store met or exceeded that brand or store's performance goals. The scheduled awarding of store management bonuses is crucial to the Debtors

go-forward operations because it allows the Debtors to adjust store specific performance goals in accordance with market fluctuations, specifically in light of the COVID-19 pandemic.

42. While the specifics of each of the Store Management Bonus Programs vary by brand and location, as a general matter, in order to be eligible to receive any bonus under the Store Management Bonus Programs, the applicable store must meet certain sales requirements and eligible Employees must be employed on the last day of the fiscal period during which the award is earned. Such bonuses are taxed and are generally paid in the last paycheck of the calendar month following the close of the month or applicable season in which the award was earned.

**B. District Managers Bonus Programs.**

43. Employees in the role of District Manager ("District Manager") at certain of the Debtors' brands are eligible to receive bonus awards under the District Managers Bonus Programs (the "District Managers Bonus Programs"). Across several of the Debtors' brands and stores, District Managers are eligible to earn a monthly, quarterly, or seasonal bonus, provided that they meet certain quarterly sales and payroll performance metrics.

44. To be eligible to receive any bonus, District Managers must be employed on the last day of the period for which the award is earned and meet the applicable monthly, quarterly, or seasonal performance goals. While specifics vary by brand and store, as a general matter, the District Managers Bonus Programs bonus is generally awarded in the last paycheck of the calendar month following the fiscal month or applicable quarter or season in which the award was earned.

**C. Distribution Center Bonus Programs.**

45. The Debtors also maintain incentive programs for certain eligible Employees that work in the Debtors' distribution centers (the "Distribution Center Bonus Programs"). The Distribution Center Bonus Programs reward certain Employees monthly incentive pay for increased productivity and additional hours worked. Payouts for Employees participating in the

Distribution Center Bonus Programs range from an additional $0.30 to $1.75 per hour worked during the applicable performance period. Further, in light of increased hours as a result of peak season and the COVID-19 pandemic, certain eligible employees obtained a $2 dollar per hour increase to regular hourly pay and eligibility for a weekly $100 bonus.

46. To be eligible to receive any bonus under the Distribution Center Bonus Programs, Employees must meet specific hourly requirements, depending on the criteria of each distribution center. Awards are paid monthly in the second pay period following the month for which the bonus was earned.

**D. Non-Insider Quarterly Incentive Program.**

47. All permanent, salaried, non-insider corporate Employees across the Debtors' brands are eligible to participate in a non-insider quarterly incentive plan (the "Non-Insider Quarterly Incentive Program"). The Non-Insider Quarterly Incentive Program is effective from July 2020 through December 2020, and provides eligible Employees an opportunity to earn incentives on a six-month basis rather than an entire fiscal year, due to the financial impact from the COVID-19 pandemic. The Non-Insider Quarterly Incentive Program is essential to not only motivate eligible non-insider Employees, but also to align their incentives with that of the current business environment.

48. The Non-Insider Quarterly Incentive Program awards bonuses based on a fixed percentage of the eligible Employee's salary, and are based on the Employee's retention and performance (based on certain approved performance metrics), earned throughout two quarterly periods, July through September (the "First Quarterly Period), and October through December (the "Second Quarterly Period"). Awards for both the First Quarterly Period and Second Quarterly Period are paid together in January. Additionally, as part of the Non-Insider Quarterly Incentive

Program, certain eligible Employees receive an award in the form of a gift card up to $500, which is based on the Debtors' quarterly retention and performance targets.

**E. 2020 Guaranteed Incentive Compensation Program.**

49. Certain non-insider Employees participating in the 2020 Guaranteed Incentive Compensation Program are guaranteed bonus amounts under an annual award program based on performance criteria. Generally, non-insider Employees employed in non-insider management positions, including as a Director, Senior Director, or Vice President (other than certain employees excluded from participation by the Board of Directors of the Company), (collectively, the "Management Employees") are eligible to participate in the guaranteed bonus program (the "2020 Guaranteed Incentive Compensation Program"). The 2020 Guaranteed Incentive Compensation Program pays bonuses that are fully earned based on performance metrics of an entire annual period.

50. Whether bonuses under the 2020 Guaranteed Incentive Compensation Program are earned is determined by the Company's annual earnings expectations and targets. The Company has sole discretion to determine whether the applicable award thresholds have been met for the annual period. Bonuses under the 2020 Guaranteed Incentive Compensation Program are paid in October.

51. The Debtors believe the Performance Incentive Programs are integral to the operation of the Debtors' business. In particular, the Performance Incentive Programs align Employees' interests with those of the Debtors generally by linking payments under the Performance Incentive Programs to performance and overall efficiency of the Debtors' operations.

**F. Referral Incentive Program.**

52. The Debtors provide cash incentives at certain distribution centers to current non-Insider Employees who refer candidates to fill identified vacant employment positions

(the "Referral Incentive Program"). Under the Referral Incentive Program, a referring Employee receives an incentive payment if the referred candidate remains employed at the end of the applicable peak season. The Referral Incentive Program award varies based on the hiring needs of the applicable distribution center, but is typically an amount between $100 to $200 dollars per referral. Referral Incentive Program awards are paid out in January following the applicable fiscal year. To be eligible, the referring Employee must be employed at the start of January when the referral bonuses are paid.

**G. Non-Insider Retention Bonus Program.**

53. The Debtors maintain a retention bonus program for certain non-insider Employees (the "Non-Insider Retention Bonus Program"). In light of the COVID-19 pandemic, the Debtors implemented the Non-Insider Retention Bonus Program to retain fourteen non-insider Employees who work in management departments that are crucial to the Debtors' operations. Bonuses awarded are approximately twenty percent of the eligible Employee's annual base salary, and are paid on a quarterly basis for retention over a six-month period from July 1, 2020 through December 31 2020, with 50 percent paid in October 2020 and 50 percent paid in January 2021. The Non-Insider Retention Bonus Program is critical to retaining key non-insider employees that are vital to maintaining the Debtors' business and maximizing value during these chapter 11 cases.

**H. Store Closing Bonus Program.**

54. Due to the COVID-19 pandemic, the Debtors made the difficult decision to close under-performing stores across several of their brands. In connection with this store-closing process, the Debtors implemented a store closing retention program to offer eligible store-level and support Employees a retention bonus conditioned on, among other criteria, their continued employment with the Debtors for the duration of the store-closing process (the "Store Closing

Bonus Program”). The program is offered to a limited number of non-insider Employees who will fulfill necessary store-closing tasks.

55. As of the Petition Date, no prepetition amounts are owed on account of the Store Closing Bonus Program because these payments are not earned until the store-closing process is complete. If all eligible Employees qualify and collect a store closing bonus, the Debtors estimate that the program will cost the Debtors *at most* approximately $425,000. The Debtors believe the cost of closing the applicable stores without these eligible Employees would cost the Debtors more than the Store Closing Bonus Program. Accordingly, the Debtors seek authority to continue the Store Closing Bonus Program in the ordinary course of business and to pay amounts owed on account of the Store Closing Bonus Program whether such amounts accrue prepetition or postpetition. The Debtors do not propose to make any payment on account of the Store Closing Bonuses to any Insider.

**III. Employee Benefit Programs.**

**A. Health and Welfare Programs.**

56. The Debtors offer a number of health and welfare benefits programs to eligible current and former Employees, including Union Employees, such as the Health Insurance Programs, the Life and AD&D Insurance, the Disability Benefits, the Workers’ Compensation Program, and pay certain administrative fees to third-party providers associated with such programs (each as defined herein, and, collectively, the “Health and Welfare Programs”).

**1. Health Insurance Programs.**

57. Employees, including Union Employees, are offered the opportunity to participate in or are otherwise provided a number of health benefit plans, including the Medical Plans, the Wellness Program, the HSA, the FSAs, the Dental Plan, and the Vision Plan (each as defined herein, and, collectively, the “Health Insurance Programs”). The Debtors also subsidize or

continue to provide certain benefits to certain former Employees after their termination, retirement, or disability leave, including (without limitation) benefits provided under the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA").

58. The Debtors offer medical and prescription drug benefit programs (the "Medical Plans") to current and Former Employees in the form of self-insured plans through Aetna Inc. ("Aetna") and CVS Caremark and fully-insured plans to certain Employees through United HealthCare ("UHA"), MSC Insurance ("MSC"), and Kaiser Permanente ("Kaiser," and, together with UHA and MSC, the "Medical Plan Administrators"). While associates across all brands are offered the same Health Insurance Programs, additional coverage may be available for certain Employees depending on the applicable state or territory. Monthly health care premiums differ depending on the Medical Plan in which the Employee or former Employee is enrolled, the Employee's compensation amounts, and whether the Employee or former Employee has dependents covered by the applicable plan. The Debtors also maintain a stop-loss insurance policy with Sun Life Financial ("Sun Life") to cover catastrophic medical claims (the "Stop-Loss Insurance"). The total cost of the Medical Plans, including the Stop-Loss Insurance, is approximately $7 million per month. The Debtors also spend approximately $6 million per month on average on medical claims asserted under the Medical Plans.

59. Employees who participate in certain of the Medical Plans may contribute a portion of their compensation into a health savings account (the "HSA"), administered by PayFlex Systems USA, Inc. ("PayFlex"), which may be used for incidental medical expenses. Participating Employees can make before-tax contributions to the HSA through payroll deductions to cover reimbursements under the program up to the maximum amount permitted by the IRS. Additionally, the Debtors provide a contribution each applicable pay period to each participating

Employee's HSA in the annual amount of $200 per Employee for Employees enrolled in employee-only coverage or $400 on an annual basis per Employee for Employees enrolled in family coverage. The Debtors' contributions, however, were suspended as a result of the COVID-19 pandemic. Currently, approximately 4,670 Employees and 225 former Employees use the HSA. The Debtors pay a monthly administration fee of approximately $12,000 to PayFlex on account of the HSA. As of the Petition Date, the Debtors do not believe they owe any amounts on behalf of the Employee HSA.

60. The Debtors also provide Employees with access to flexible spending accounts, the health care flexible spending accounts (the "HCFSA"), and the dependent child care flexible spending accounts (the "DCFSA," and, together with the HCFSA, the "FSAs"). The FSAs are administered by WageWorks, Inc. ("WageWorks"), which can be used to cover incidental medical costs or dependent child care. Currently, approximately 353 Employees use the HCFSA for medical costs and 221 Employees use the DCFSA and for dependent child care. The Debtors do not make any contributions to any Employee's FSA. As of the Petition Date, the Debtors do not believe they owe any amounts on behalf of the Employee FSAs.

61. The Debtors also provide vision insurance through EyeMed Vision Care (the "Vision Plan"). The Vision Plan is fully insured. The total cost of the Vision Plan is approximately $62,000 each month, which is funded entirely by Employee contributions and former Employee contributions. As of the Petition Date, the Debtors estimate that they hold approximately $62,000 in accrued but unremitted Employee-contributed premiums on account of the Vision Plan.

62. The Debtors also provide dental insurance through Delta Dental Insurance (the "Dental Plan"). The Dental Plan is fully insured. The total cost of the Dental Plan is

approximately $390,000 each month, which is funded entirely by Employee contributions and former Employee contributions. As of the Petition Date, the Debtors estimate that they hold approximately $390,000 in accrued but unremitted Employee-contributed premiums on account of the Dental Plan.

63. Additionally, the Debtors work with certain vendors to assist in the administration, advisement, and management of the Medical Plans, including Alight Solutions ("Alight") and Aon plc ("Aon"). The Debtors spend approximately $112,588.75 per month on average on account of Alight and approximately $13,000 per month on account of Aon.

64. In sum, the Debtors spend approximately $1 million per month on average on the Health Insurance Programs. Of this amount, certain vendors under the Health Insurance Programs are paid in arrears, and certain are paid in advance on a monthly, quarterly, or annual basis. As of the Petition Date, the Debtors do not believe they owe any accrued but unpaid amounts on account of the Health Insurance Programs; however, for the avoidance of doubt, the Debtors seek to maintain the Health Insurance Programs in the ordinary course of business.

**2. Insurance, Disability, and Workers' Compensation Programs.**

**a. Life and AD&D Insurance Programs.**

65. The Debtors provide life and accidental death and dismemberment insurance coverage (the "Basic Life and AD&D Insurance") to current and certain former Employees, including Union Employees, through Reliance Standard Life Insurance Co. ("Reliance"), which each provide maximum coverage of $1,500,000 in the event of an Employee's death or dismemberment. Current Employees may also purchase supplemental life insurance and accidental death and dismemberment insurance (the "Supplemental Life and AD&D Insurance" and, together with the Basic Life and AD&D Insurance, the "Life and AD&D Insurance") covering themselves and their spouses and children, through Reliance. Full-time Employees are eligible for

company sponsored Life and AD&D Insurance upon completion of a benefit eligibility waiting period on the first of the month following 30 days of continuous employment.

66. The total cost of the Life and AD&D Insurance is approximately $91,000 each month, of which approximately $69,000 is paid by Employees and $22,000 is paid by the Debtors. As of the Petition Date, the Debtors estimate that the amount of accrued but unpaid obligations on account of the Life and AD&D Insurance is approximately $91,000.

**b. Disability Benefits.**

67. The Debtors provide Employees, including Union Employees, with short- and long-term disability benefits (the "Disability Benefits"). Full-time Employees are eligible for Disability Benefits upon completion of a benefit eligibility waiting period. Under the short-term disability benefits program, Employees are entitled to, among other things, continuation of 100 percent of their base wages in the event of a short-term medical disability due to an illness, injury, or pregnancy related condition for the first eight consecutive weeks, after which the Employees are paid 70 percent of their base wages for a total of 26 weeks of disability (the "Short-Term Disability Benefits"). Such payments are made out of the Debtors' ordinary payroll processing.

68. Under the long-term disability benefits program, Employees are entitled to, among other things, continuation of 60 percent of their wages, up to a monthly limit of $12,500, in the event of a long-term medical disability due to illness or injury (the "Long-Term Disability Benefits" and, together with the Short-Term Disability Benefits, the "Disability Benefits"). To qualify, an Employee must be disabled for 180 consecutive days. The Long-Term Disability Benefits premiums are paid solely by Employees. The Disability Benefits are administered by Reliance.

69. Currently, 8,900 Employees are eligible to receive Short-Term Disability Benefits through the Debtors' automatic enrollment process, and 6,200 Employees are eligible to receive Long-Term Disability Benefits. In the twelve months before the Petition Date, the Debtors paid an average of approximately $130,000 per month in administrative fees and premiums with respect to the Disability Benefits, of which $26,000 is paid on account of the Short-Term Disability Benefits and $104,000 is paid on account of Long-Term Disability Benefits premiums, funded solely by Employees. As of the Petition Date, the Debtors estimate that the amount of accrued but unpaid obligations on account of the Disability Benefits is approximately $130,000, all of which will come due within the Interim Period. The Debtors seek authority to pay all prepetition amounts due under the Disability Benefits and to continue the Disability Benefits on a postpetition basis in the ordinary course of business.

70. In the twelve months before the Petition Date, the Debtors paid an average of approximately $17,000 per month in administrative fees and premiums with respect to the Life and AD&D Insurance and Disability Benefits. As of the Petition Date, the Debtors estimate that the amount of accrued but unpaid obligations on account of the Life and AD&D Insurance and Disability Benefits is approximately $17,000.

**c. Workers' Compensation Program.**

71. The Debtors maintain workers' compensation insurance for Employees, including Union Employees, at the levels required by laws in the states in which the Debtors operate (collectively, the "Workers' Compensation Program"). The Debtors maintain coverage for the Workers' Compensation Program through Safety National Insurance ("Safety National"), Sedgwick Claims Management Services ("Sedgwick Claims"), Gallagher Bassett Services, Inc. ("Gallagher Bassett"), Broadspire, Travelers Companies, Inc. ("Travelers"), Liberty Mutual Insurance Co. ("Liberty Mutual"), and The Hartford Financial Services Group, Inc. ("Hartford,"

and together with Safety National, Sedgwick Claims, Gallagher Basset, Broadspire, Travelers, and Liberty Mutual, the "Workers' Compensation Vendors"). The Debtors pay approximately $1 million in premiums and fees annually to maintain the Workers' Compensation Program. By this Motion, the Debtors seek authority to pay accrued but unpaid prepetition amounts related to the Workers' Compensation Program, continue and maintain the Workers' Compensation Program in the ordinary course of business, and modify the automatic stay to allow Employees to assert claims under the Workers' Compensation Program to the extent applicable. As of the Petition Date, the Debtors do not owe any amounts on the Workers' Compensation Program.

72. The Debtors must continue the claim assessment, determination, adjudication, and payment process pursuant to the Workers' Compensation Program without regard to whether such liabilities are outstanding before the Petition Date to ensure that the Debtors comply with applicable workers' compensation laws and requirements.[7] There are currently 7,086 open claims under the Workers' Compensation Program. As of the Petition Date, the Debtors do not believe there are any amounts outstanding on account of the Workers' Compensation Program; however, for the avoidance of doubt, the Debtors seek to maintain the Workers' Compensation Program in the ordinary course of business.

73. The Workers' Compensation Program is subject to regular audits (the "Workers' Compensation Audits"), which may result in an adjustment of the premiums owed on account thereof. Workers' Compensation Audits for prepetition premium payments will not conclude until after the Petition Date. As a result, the aggregate amount of the Debtors' obligations arising from the Workers' Compensation Audits is not known at this time. Accordingly, the Debtors seek

[7] The Debtors' Workers' Compensation Program may change postpetition in the ordinary course of business due to changes in applicable laws and regulations and the Debtors' ability to meet requirements thereunder.

authority to honor any amounts owed on account of any Workers' Compensation Audits in the ordinary course of business.

**B. Retirement Plans.**

74. The Debtors offer certain Employees and former Employees the opportunity to participate in the 401(k) Plan, the NQDC Plan, and the Supplemental Retirement Plans (each as defined herein and, collectively, the "Retirement Plans").

**1. 401(k) Plan.**

75. The Debtors offer all their Employees the opportunity to participate in a 401(k) plan (the "401(k) Plan"). Employees age 21 or over become eligible to participate in the 401(k) Plan upon completing 1,000 hours of service within a twelve-month period following their date of hire. The 401(k) Plan generally provides for pre-tax and post-tax salary deductions of compensation up to limits set by the Internal Revenue Code. Each Employee's 401(k) contributions are deducted automatically from each paycheck. The Debtors eliminated 401(k) matching contributions as of April 26, 2020, but previously matched the Employees' 401(k) Plan contributions dollar-for-dollar in an amount up to 100 percent of the Employees' first three percent of eligible compensation, and 50 percent of the Employee's first four to five percent of eligible compensation (the "401(k) Contributions"). Generally, the 401(k) Contributions were made by the Debtors on or just following each pay date. As a result of the COVID-19 pandemic, the Debtors suspended 401(k) Contributions. The Debtors do not believe that they owe any 401(k) Contributions as of the Petition Date; however, out of an abundance of caution, seek authority to honor their commitment to 401(k) Contributions (whether due prepetition or arising postposition) in the ordinary course on a postpetition basis.

76. The 401(k) Plan is administered by the Massachusetts Mutual Life Insurance Company ("Mass Mutual") for U.S. Employees and by the Charles Schwab Corporation

("Charles Schwab") for Employees based in Puerto Rico. HighTower Advisors ("HighTower") serves as the 401(k) Plan fiduciary and consultant. The 401(k) Plan allows for automatic pre-tax and post-tax wage deductions of eligible compensation up to the limits set forth by the Internal Revenue Code. In the twelve months before the Petition Date, the Debtors' monthly payments and disbursements on account of 401(k) Contributions averaged approximately $786,408 and the Employee contributions averaged approximately $1,669,633 million. As of the Petition Date, the Debtors estimate that they do not owe any amounts on account of the 401(k) Plan. Accordingly, the Debtors request authority to continue to honoring their obligations on account of the 401(k) Contributions and 401(k) Plan on a postpetition basis in the ordinary course of business.

**2. Non-Qualified Deferred Compensation Plan.**

77. The Debtors also maintain a non-qualified deferred compensation plan that allows certain highly compensated individuals to defer a portion of their base salary and performance bonus through pre-tax contributions to a non-qualified deferred compensation plan (the "NQDC Plan"). Eligible employees have the opportunity to enroll in the first day of the calendar quarter following their employment or upon promotion to an eligible position. Once enrolled, eligible employees may defer payment of certain earned compensation until a future date. Additionally, eligible employees qualify for matching contributions in addition to their 401k matched amounts, for a total of five percent of their compensation when combined with the 401k Contributions (the "NQDC Employer Contributions"). Employee contributions to the NQDC Plan vest immediately, while the NQDC Employer Contributions vest on a pre-determined timeline from 0 percent to 100 percent over a five-year employment span. Additionally, the NQDC Employer Contributions are made solely at the discretion of the Debtors on the calendar year following the Employee contributions.

78. Under the NQDC Plan, eligible Employees may choose to distribute each year's deferred compensation in either: (i) a retirement account, which defers distributions until six months after the last day of employment; (ii) an in-service account, which provides a scheduled distribution during employment in the form of either a lump sum or four annual installments; or (iii) an education account, which provides a scheduled distribution during employment toward an appointed student's degree in either a lump sum or four annual installments.

79. Approximately 91 Employees participate in the NQDC Plan with Principal serving as the service provider. In the past twelve months, Employees contribute approximately $1,459,368 to the NQDC Plan. The Debtors pay a $10,000 annual flat rate and a tiered participant fee based on enrollment (the "NQDC Plan Fees"). On an annual basis the Debtors pay approximately $20,000 in NQDC Plan Fees. As of the Petition Date, the Debtors estimate that they owe $15,000 on account of the NQDC Plan Fees. The Debtors further estimate that they may owe approximately $17.45 million in the aggregate on account of the NQDC Plan, owed to both active Employees and non-active former Employees. By this Motion, the Debtors seek authority, on a final basis only, to pay prepetition and postpetition NQDC Plan amounts outstanding as they come due in the ordinary course of business, and to continue the NQDC Plan on a postpetition basis in the ordinary course of business.[8]

**3. Supplemental Retirement Plans.**

80. The Debtors also owe payments on a variety supplemental retirement plans for a small number of eligible Employees (the "Supplemental Retirement Plans"). The Supplemental Retirement Plans includes, (i) a frozen pension plan for eight former Employees who receive

[8] For the avoidance of doubt, the NQDC Plan benefits will continue in the ordinary course but will not accelerate upon the effectiveness of a Restructuring Transaction (as defined in the Restructuring Support Agreement).

approximately $134.00 to $432.65 on a monthly basis and (ii) an individual retirement plan as part of the Charming Shoppes acquisition for one former Employee, who receives approximately $157.80 each month and $582.60 bi-monthly in retirement benefits.

81. As of the Petition Date, the Debtors estimate that they owe approximately $2,000 on account of the Supplemental Retirement Plans. The amount that the Debtors pay to recipients each month varies depending on, among other things, the date of the retirement of the recipients. The Debtors seek authority, on a final basis only, to pay prepetition and postpetition amounts outstanding as they come due in the ordinary course of business, and to continue these programs in the ordinary course of business on a postpetition basis.

**C. Assistance Programs.**

82. The Debtors offer a number of assistance programs to Employees, including Union Employees, such as the Employee Assistance Program, the Immigration Assistance Program, and the Additional Assistance Programs, and pay certain administrative fees to third-party providers associated with such programs (each as defined herein, and collectively, the "Assistance Programs").

83. The Debtors provide the Employees, including Union Employees with a confidential counseling and referral service (the "Employee Assistance Program"). The Employee Assistance Program pairs Employees with masters and doctoral level clinicians, Certified Public Accountants and Certified Financial Planners, and attorneys. The Employee Assistance Program is administered by ACI Specialty Benefits ("ACI"). On an average annual basis, the Debtors pay $180,000 on account of the Employee Assistance Program. As of the Petition Date, the Debtors estimate that they owe approximately $15,000 on account of the Employee Assistance Program, all of which will come due within the Interim Period.

84. The Debtors also provide immigration-related assistance to Employees who require a visa or other immigration services in connection with their job (the "Immigration Assistance Program"). The Immigration Assistance Program provides Employees approximately 68 Employees professional assistance in obtaining a work-related visa, covering costs such as filing fees, legal fees, and other administrative expenses. On an average annual basis, the Debtors pay $324,345.96 on account of the Immigration Assistance Program. As of the Petition Date, the Debtors do not believe they owe any amounts on account of the Immigration Assistance Program; however, for the avoidance of doubt, the Debtors seek authority to continue the Immigration Assistance Program in the ordinary course of business on a postpetition basis.

85. In the ordinary course of business, the Debtors also offer eligible Employees the opportunity to participate in a variety of miscellaneous assistance programs and partnerships (collectively, the "Additional Assistance Programs"), such as financial advising through HighTower, a travel emergency assistance program, emergency backup childcare and eldercare partnerships, and an adoption assistance program. In the twelve months before the Petition Date, the Debtors paid on average, approximately $20,000 per month on account of the Additional Assistance Programs. As of the Petition Date, the Debtors estimate that they owe approximately $20,000 on account of the Additional Assistance Programs, all of which will come due within the Interim Period.

**4. Commuter Programs.**

86. Eligible Employees may choose to defer a dollar amount for qualified parking expenses (the "Parking Program") up to the IRS maximum, which for 2020 is $270 per month, pre-tax. Qualified parking is defined as parking that is on or near the Employee's workplace or parking that is on or near mass transit or vanpool used by the Employee for commuting to work. Employees may choose to have monthly payments mailed directly to a parking provider or

purchase a prepaid Commuter Check Card Prepaid MasterCard that may be used as a credit or debit card to pay for parking expenses.

87. Eligible Employees may also choose to defer a dollar amount for qualified mass transit expenses (the "Transit Program" and, together with the Parking Program, the "Commuter Programs") up to the IRS maximum, which for 2020 is $270 per month, pre-tax. Any amount over the IRS maximum is deferred on a post-tax basis. Employees may choose to have monthly transit passes from their transit providers mailed to their homes, vouchers mailed to their homes, or receive a Commuter Check Card Prepaid MasterCard that may be used as a credit or debit card to pay for transit expenses. Fees on account of the Commuter Programs are taken directly from the Employee's paycheck and are processed by ADP Processing.

**D. Paid and Unpaid Leave.**

88. The Debtors provide leave to Employees in the form of Paid Time Off, Paid Leave, and Unpaid Leave (each as defined below).

89. In the ordinary course of business, the Debtors provide paid time off and non-statutory sick pay ("Paid Time Off") to the Employees as a Paid Leave benefit that may be used for any reason. Paid Time Off generally accrues at specified rates up to a maximum amount based on the Employee's level, area of employment, and years of service. As of the Petition Date, the Debtors estimate that approximately $1.2 million in Paid Time Off has accrued but has not been used by Employees. This amount, however, is not a current cash payment obligation. By this Motion, the Debtors seek authority, but not direction, to pay any "cash out" amounts due with respect to earned but unused Paid Time Off and to continue the Paid Time Off policies in the ordinary course. For the avoidance of doubt, the Debtors seek to pay Paid Time Off to any Employee in excess of the $13,650 priority cap imposed by section 507(a)(4) of the Bankruptcy Code solely pursuant to the Final Order, and not pursuant to the Interim Order.

90. In addition, the Debtors provide certain other forms of paid leave, including:

- paid holidays throughout the year, during which Employees are not required to work and are paid their base rate of pay (the "Holidays");

- leave under the Family and Medical Leave Act (the "FMLA") for: (a) birth, adoption, or foster care; (b) family care; (c) medical emergencies; (d) military exigencies; and (e) military caregiving needs (the "FMLA Leave");

- paid new parent leave (the "New Parent Leave") for all full-time associates who welcome a new child into their lives through birth or placement for adoption or foster care; and

- other paid and unpaid leaves of absence for personal reasons, many of which are required by law, including statutory sick leave, missed work time in the ordinary course of business for bereavement leave, jury or court attendance, or time spent voting (the "Other Paid Leave," and, together with the Holidays, FMLA Leave, New Parent Leave, and Other Paid Leave, the "Paid Leave").

The Debtors also provide unpaid leaves of absence for family medical leaves and military leaves (the "Unpaid Leave"). The Other Paid Leave and Unpaid Leave do not involve incremental cash outlays beyond standard payroll obligations.

91. The Debtors believe that the continuation of the Paid Leave and Unpaid Leave policies in accordance with prior practice is essential to maintaining Employee morale during these chapter 11 cases. Further, the policies are broad-based programs upon which all Employees have come to depend. The Debtors anticipate that their Employees will utilize any accrued Paid Leave in the ordinary course of business, which will not create any material cash flow requirements beyond the Debtors' normal payroll obligations.

**E. Severance.**

92. In the ordinary course of business, the Debtors maintain a severance program for the benefit of certain non-insider Employees (the "Non-Insider Severance Program"). Certain Employees are eligible, on a discretionary basis, for severance benefits if such non-insider

Employees are terminated due to a work-force adjustment or any not-for-cause employer-initiated termination. Pursuant to the Non-Insider Severance Program, eligible Employees, upon termination and on a discretionary basis, are entitled to receive payments at base compensation levels (based on their job position) in accordance with standard company guidelines (the "Non-Insider Severance Benefits")[9]. These guidelines provide that non-insider Employees accrue Non-Insider Severance Benefits at various rates (ranging from one week to 52 weeks of Non-Insider Severance Benefits) based on length of service and seniority. Non-Insider Severance Benefits are offered only to full-time Employees who are regularly scheduled to work 30 hours or more per week. Part-time, seasonal, or otherwise temporary Employees, including independent contractors or consultants, are not eligible to receive Non-Insider Severance Benefits.

93. The Debtors' ability to pay and provide severance amounts and other benefits has been critical to maintaining Employee morale and loyalty. Increased instability in the Debtors' workforce will only undermine the Debtors' ability to strengthen their financial and operational foundation, to generate growth, and to be positioned for long-term success. As a condition to participating in the Non-Insider Severance Program or receiving any Non-Insider Severance Benefits, the Debtors always require that each Employee execute a release agreement, whereby the Employee releases any claims held against the Debtors. Additionally, Non-Insider Severance Benefits are paid over time and are terminated when the severed Employee acquires new employment.

94. The Debtors believe that the Non-Insider Severance Program and the Non-Insider Severance Benefits will help reduce the time and expense that could arise in the absence of the

---

[9] In the event of a qualifying change of control termination, severance benefits vest immediately along with all incentive opportunities.

Non-Insider Severance Program and the Non-Insider Severance Benefits to defend the assertion of claims by any severed Employees.

95. As of the Petition Date, the Debtors believe that 87 former Employees are entitled to Non-Insider Severance Benefits. The Debtors estimate that, as of the Petition Date, the aggregate amount of accrued but unpaid obligations under the Non-Insider Severance Program is approximately $3.26 million. As outlined in the First Day Declaration, the Debtors made the difficult decision to close many of the under-performing brick and mortar locations. As a result, a number of non-insider Employees will be severed and will be owed postpetition amounts on account of Non-Insider Severance Benefits, which the Debtors' seek authority to pay in the ordinary course of business. By this Motion, the Debtors seek authority to continue the Non-Insider Severance Program and pay obligations thereunder, including accrued prepetition obligations and postpetition obligations arising during the course of these chapter 11 cases, on a final basis. For the avoidance of doubt, the Debtors do not seek authority to pay obligations on account of the Non-Insider Severance Program on an interim basis.

**F. Postpetition Non-Employee Director Compensation.**

96. Certain of the Debtors maintain boards of directors (or boards of managers, as applicable) that include non-Employee directors (or managers, as applicable) (each, a "Director"). As of the Petition Date, the Debtors' boards of directors included eight non-Employee Directors.

97. Each of the non-Employee Directors, except for the Disinterested Directors, currently receive an $80,000 annual retainer, which is paid in advance on a quarterly basis in cash (the "Annual Retainer"). The disinterested Directors receive a $265,000 annual retainer (the "Disinterested Director Retainer"), which is paid in advance on a monthly basis. The non-Employee Directors who serve as board committee chairs also receive annual retainers between $5,000 and $10,000 payable in advance on a quarterly basis (together the "Committee

Chair Retainers"). The non-Employee Directors, except for the disinterested Directors, are also entitled to an additional cash retainer of $65,000 (the "Additional Cash Retainer"), retainers between $10,000 and $15,000 for serving on committees (the "Committee Member Retainers"), and one director receives a lead independent director retainer of $15,000 (the "Lead Independent Director Retainer"). The non-Employee Directors are entitled to expense reimbursement for certain out-of-pocket expenses, such as travel reimbursements, and the disinterested Directors are entitled to additional per diem compensation for special services (collectively with the Annual Retainer, Disinterested Director Retainer, Committee Chair Retainers, Additional Cash Retainer, Committee Member Retainers, and Lead Independent Director Retainer, the "Director Compensation"). In the 12 months before the Petition Date, the Debtors paid approximately $18,000 on account of Director out-of-pocket expense reimbursements, all of which were reimbursements for travel expenses. Additionally, Director Compensation is payable in advance in equal installments on a quarterly basis.

98. As of the Petition Date, the Debtors do not believe they owe any amounts on account of Director Compensation and believe that they are authorized to pay any postpetition Director Compensation in the ordinary course. However, out of an abundance of caution, by this Motion, the Debtors seek authority to continue to pay the Director Compensation on a postpetition basis in the ordinary course of business and consistent with their prepetition practices on a final basis. For the avoidance of doubt, the Debtors do not seek authority to pay any amounts on account of Director Compensation on an interim basis.

## Basis for Relief

### I. Sufficient Cause Exists to Authorize the Debtors to Honor the Employee Compensation and Benefits Programs.

#### A. Certain Employee Compensation and Benefits Programs Are Entitled to Priority Treatment.

99. Sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code entitle certain of the Employee Compensation and Benefits Programs owed to the Employees to priority treatment to the extent such payments do not exceed $13,650 for each individual as provided for under sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code. As priority claims, the Debtors are required to pay these claims in full to confirm a chapter 11 plan. *See* 11 U.S.C. § 1129(a)(9)(B) (requiring payment in full of certain allowed unsecured claims for (a) wages, salaries, or commissions, including severance, and sick leave pay earned by an individual, and (b) contributions to an employee benefit plan). To the extent that an Employee receives more than $13,650 on account of claims entitled to priority, the relief requested herein only affects the timing of certain payments to the Employees, and does not have any material negative impact on recoveries for general unsecured creditors. Indeed, the Debtors submit that payment of the Employee Compensation and Benefits Programs at this time enhances value for the benefit of all interested parties.

#### B. Payment of Certain Employee Compensation and Benefits Programs Is Required by Law.

100. The Debtors seek authority, but not direction, to pay the Withholding Obligations to the appropriate third-party entities. These amounts principally represent Employee earnings that governments, Employees, and judicial authorities have designated for deduction from the Employees' paychecks. Indeed, certain Withholding Obligations are not property of the Debtors' estates because the Debtors have withheld such amounts from the Employees' paychecks on another party's behalf. *See* 11 U.S.C. §§ 541(b)(1), (d). Furthermore, federal and state laws

require the Debtors to withhold certain tax payments from the Employees' paychecks and to pay such amounts to the appropriate taxing authority. 26 U.S.C. §§ 6672, 7501(a); *see also City of Farrell v. Sharon Steel Corp.*, 41 F.3d 92, 95–97 (3d Cir. 1994) (finding that state law requiring a corporate debtor to withhold city income tax from its employees' wages created a trust relationship between debtor and the city for payment of withheld income taxes); *In re DuCharmes & Co.*, 852 F.2d 194, 196 (6th Cir. 1988) (noting that individual officers of a company may be held personally liable for failure to pay trust fund taxes). Because the Withholding Obligations may not be property of the Debtors' estates, the Debtors request that the Court authorize them to transmit the Withholding Obligations on account of the Employees to the proper parties in the ordinary course of business. *See In re Dameron*, 155 F.3d 718, 721 (4th Cir. 1998). The Debtors therefore request that the Court recognize that the Withholding Obligations are not property of the Debtors' estates and, regardless of whether the Debtors collected the amounts prior to the Petition Date, authorize the Debtors to transmit such monies to the proper parties in the ordinary course of business.

101. Similarly, state laws require the Debtors to maintain the Workers' Compensation Program. If the Debtors fail to maintain the Workers' Compensation Program, state laws may prohibit the Debtors from operating in those states. Payment of all Workers' Compensation Program amounts is therefore crucial to the Debtors' continued operations and the success of the Debtors' restructuring. The Debtors therefore request that the Court authorize the Debtors to maintain the Workers' Compensation Program.

## II. Payment of the Employee Compensation and Benefits Programs Is Proper Pursuant to Section 363(b) of the Bankruptcy Code and the Doctrine of Necessity.

102. Section 363 of the Bankruptcy Code provides, in relevant part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Under section 363(b) of the Bankruptcy Code,

courts require only that the debtor "show that a sound business purpose" justifies the proposed use of property. *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999); *see also Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070–71 (2d Cir. 1983) (requiring a "good business reason" to approve a sale pursuant to section 363(b)); *In re W.A. Mallory Co.*, 214 B.R. 834, 836 (Bankr. E.D. Va. 1997) ("This Court follows the 'sound business purpose' test when examining § 363(b) sales.") (citing *In re WBQ P'ship*, 189 B.R. 97, 102 (Bankr. E.D. Va. 1995)). Moreover, "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *In re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986); *see also In re Tower Air, Inc.*, 416 F.3d 229, 238 (3d Cir. 2005) ("Overcoming the presumptions of the business judgment rule on the merits is a near-Herculean task."). Thus, if a transaction satisfies the business judgment rule, it should be approved under section 363(b) of the Bankruptcy Code.

103. Furthermore, section 105(a) of the Bankruptcy Code further provides that a court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of" the Bankruptcy Code, pursuant to the "doctrine of necessity." 11 U.S.C. § 105(a). The "doctrine of necessity" functions in a chapter 11 case as a mechanism by which the bankruptcy court can exercise its equitable power to allow payment of critical prepetition claims not explicitly authorized by the Bankruptcy Code and further supports the relief requested herein. *See In re United Am., Inc.*, 327 B.R. 776, 781 (Bankr. E.D. Va. 2005) (acknowledging the doctrine of necessity "is a necessary deviation because otherwise there will be no reorganization and no creditor will have an opportunity to recoup any part of its pre-petition claim"); *In re NVR L.P.*, 147 B.R. 126, 127 (Bankr. E.D. Va. 1992) ("Under [section 105(a)] the court can permit pre-plan

payment of a pre-petition obligation when essential to the continued operation of the debtor."); *see also In re Lehigh & New Eng. Ry.*, 657 F.2d 570, 581 (3d Cir. 1981) (holding that a court may authorize payment of prepetition claims if such payment is essential to debtor's continued operation); *see also In re Just for Feet, Inc.*, 242 B.R. 821, 824–25 (D. Del. 1999) (holding that section 105(a) of the Bankruptcy Code "provides a statutory basis for payment of pre-petition claims" under the doctrine of necessity); *In re Columbia Gas Sys., Inc.*, 171 B.R. 189, 191–92 (Bankr. D. Del. 1994) (explaining that the doctrine of necessity is the standard in the Third Circuit for enabling a court to authorize the payment of prepetition claims prior to confirmation of a reorganization plan).

104. Moreover, the doctrine of necessity is designed to foster a debtor's rehabilitation, which courts have recognized is "the paramount policy and goal of Chapter 11." *Ionosphere Clubs*, 98 B.R. at 176; *see also In re Quality Interiors, Inc.*, 127 B.R. 391, 396 (Bankr. N.D. Ohio 1991) ("[P]ayment by a debtor-in-possession of pre-petition claims outside of a confirmed plan of reorganization is generally prohibited by the Bankruptcy Code," but "[a] general practice has developed . . . where bankruptcy courts permit the payment of certain pre-petition claims, pursuant to 11 U.S.C. § 105, where the debtor will be unable to reorganize without such payment."); *In re Eagle-Picher Indus., Inc.*, 124 B.R. 1021, 1023 (Bankr. S.D. Ohio 1991) (approving payment of prepetition unsecured claims of toolmakers as "necessary to avert a serious threat to the Chapter 11 process"); *Mich. Bureau of Workers' Disability Comp. v. Chateaugay Corp. (In re Chateaugay Corp.)*, 80 B.R. 279, 285–86 (S.D.N.Y. 1987) (approving lower court order authorizing payment of prepetition wages, salaries, expenses, and benefits).

105. Payment of the Employee Compensation and Benefits Programs is warranted under this authority and the facts of these chapter 11 cases. Employees will be exposed to significant

financial difficulties if the Debtors are not permitted to honor obligations for unpaid Employee Compensation and Benefits Programs. Additionally, continuing ordinary course benefits will help maintain Employee morale and minimize the adverse effect of the commencement of these chapter 11 cases on the Debtors' ongoing business operations.

106. Moreover, Employees provide the Debtors with services necessary to conduct the Debtors' businesses, and the Debtors believe that absent the payment of the Employee Compensation and Benefits Programs owed to the Employees, the Debtors may experience Employee turnover and instability at this critical time in these chapter 11 cases. The Debtors believe that without these payments, the Employees may become demoralized and unproductive because of the potential significant financial strain and other hardships the Employees may face. Such Employees may then elect to seek alternative employment opportunities. Additionally, a significant portion of the value of the Debtors' business is tied to their workforce, which cannot be replaced without significant efforts—which efforts may not be successful given the overhang of these chapter 11 cases. Enterprise value may be materially impaired to the detriment of all stakeholders in such a scenario. The Debtors therefore believe that payment of the prepetition obligations with respect to the Employee Compensation and Benefits Programs is a necessary and critical element of the Debtors' efforts to preserve value and will give the Debtors the greatest likelihood of retention of their Employees as the Debtors seek to operate their businesses in these chapter 11 cases.

107. Courts in this and other districts have granted similar relief to that requested in this Motion in previous chapter 11 cases. *See, e.g.*, *In re Intelsat S.A.*, No. 20-32299 (KLP) (Bankr. E.D. V.A. June 9, 2020) (authorizing the Debtors to pay employee compensation and continue benefit programs); *In re Pier 1 Imports, Inc.*, No. 20-30805 (KRH) (Bankr. E.D. Va. Mar. 13,

2020) (same); *In re Toys "R" Us, Inc.*, No. 17-34665 (KLP) (Bankr. E.D. Va. Oct. 24, 2017) (same); *In re Gymboree Corp.*, No. 17-32986 (KLP) (Bankr. E.D. Va. July 11, 2017) (same); *In re Penn Virginia Corp.*, No. 16-32395 (KLP) (Bankr. E.D. Va. June 9, 2016) (same).[10] Accordingly, the Debtors respectfully request that the Court authorize the Debtors to pay and continue the Employee Compensation and Benefits Programs in the ordinary course of business and consistent with past practice.

## III. A Limited Waiver of the Automatic Stay for Workers' Compensation Claims Is Appropriate Here.

108. Section 362(a) of the Bankruptcy Code operates to stay "the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title . . . ." 11 U.S.C. § 362(a)(1).

109. Section 362 of the Bankruptcy Code, however, permits a debtor or other parties in interest to request a modification or termination of the automatic stay for "cause." *Id.* at § 362(d)(1). Cause exists here to modify the automatic stay to permit the Employees to proceed with workers' compensation claims in the appropriate judicial or administrative forum. Staying the workers' compensation claims could have a detrimental effect on the financial well-being and morale of the Employees.

## Processing of Checks and Electronic Fund Transfers Should be Authorized

110. The Debtors have sufficient funds to pay the amounts described in this Motion in the ordinary course of business by virtue of expected cash flows from ongoing business operations

---

[10] Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available upon request to the Debtors' proposed counsel.

and anticipated access to debtor-in-possession financing and cash collateral. In addition, under the Debtors' existing cash management system, the Debtors can readily identify checks or wire transfer requests as relating to an authorized payment in respect of the Employee Compensation and Benefits Programs, as applicable. Accordingly, the Debtors believe that checks or wire transfer requests, other than those relating to authorized payments, will not be honored inadvertently. Therefore, the Debtors respectfully request that the Court authorize all applicable financial institutions, when requested by the Debtors, to receive, process, honor, and pay any and all checks or wire transfer requests in respect of the relief requested in this Motion.

**<u>The Requirements of Bankruptcy Rule 6003 Are Satisfied</u>**

111. Bankruptcy Rule 6003 empowers a court to grant relief within the first 21 days after the Petition Date "to the extent that relief is necessary to avoid immediate and irreparable harm." For the reasons discussed above, authorizing the Debtors to (a) pay all prepetition and postpetition obligations on account of the Employee Compensation and Benefits Programs (as defined below) in the ordinary course of business, (b) continue to administer the Employee Compensation and Benefits Programs, including payment of prepetition obligations related thereto, as well as granting the other relief requested herein is integral to the Debtors' ability to transition their operations into these chapter 11 cases. Failure to receive such authorization and other relief during the first 21 days of these chapter 11 cases would severely disrupt the Debtors' operations at this critical juncture. For the reasons discussed herein, the relief requested is necessary in order for the Debtors to operate their businesses in the ordinary course and preserve the ongoing value of the Debtors' operations and maximize the value of their estates for the benefit of all stakeholders. Accordingly, the Debtors submit that they have satisfied the "immediate and irreparable" standard of Bankruptcy Rule 6003 to support granting the relief requested herein.

**Waiver of Bankruptcy Rule 6004(a) and 6004(h)**

112. To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

**Waiver of Memorandum of Points and Authorities**

113. The Debtors respectfully request that this Court treat this Motion as a written memorandum of points and authorities or waive any requirement that this Motion be accompanied by a written memorandum of points and authorities as described in Local Bankruptcy Rule 9013-1(G).

**Reservation of Rights**

114. Nothing contained herein is intended or shall be construed as: (a) an admission as to the amount of, basis for, or validity of any claim against the Debtors under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; or (g) a waiver of any claims or causes of action which may exist against any entity under the Bankruptcy Code or any other applicable law. If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the Debtors' rights to subsequently dispute such claim.

**Notice**

115. The Debtors will provide notice of this Motion via first class mail, facsimile or email (where available) to: (a) the United States Trustee for the Eastern District of Virginia; (b) the holders of the 50 largest unsecured claims against the Debtors (on a consolidated basis); (c) the agents under the Debtors' prepetition secured facilities and counsel thereto; (d) the DIP Agents and their respective counsel thereto; (e) counsel to the Ad Hoc Group; (f) the United States Attorney's Office for the Eastern District of Virginia; (g) the Internal Revenue Service; (h) the office of the attorneys general for the states in which the Debtors operate; (i) the Securities and Exchange Commission; and (j) any party that has requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "Notice Parties"). The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

**No Prior Request**

116. No prior request for the relief sought in this Motion has been made to this or any other court.

[*Remainder of page intentionally left blank*]

WHEREFORE, the Debtors respectfully request that the Court enter the Interim Order and Final Order granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

Richmond, Virginia
Dated: July 23, 2020


*/s/ Cullen D. Speckhart*
**COOLEY LLP**
Cullen D. Speckhart (VSB 79096)
*Admitted to practice in New York, Virginia, Missouri and Texas; Not admitted to practice in DC, supervised by members of DC bar*
Olya Antle (VSB 83153)
*Admitted to practice in Virginia; Not admitted to practice in DC, supervised by members of DC bar*
1299 Pennsylvania Avenue, NW, Suite 700
Washington, DC 20004-2400
Telephone: (202) 842-7800
Facsimile: (202) 842-7899
Email: cspeckhart@cooley.com
oantle@cooley.com-

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C.
Steven N. Serajeddini, P.C. (*pro hac vice* pending)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
Email: edward.sassower@kirkland.com
steven.serajeddini@kirkland.com

-and-

John R. Luze (*pro hac vice* pending)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
Email: john.luze@kirkland.com

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

**Exhibit A**

**Proposed Interim Order**

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C.
Steven N. Serajeddini, P.C. (*pro hac vice* pending)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

-and-

John R. Luze (*pro hac vice* pending)
300 North LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

**COOLEY LLP**
Cullen D. Speckhart (VSB 79096)
*Admitted to practice in New York, Virginia, Missouri and Texas; Not admitted to practice in DC, supervised by members of DC bar*
Olya Antle (VSB 83153)
*Admitted to practice in Virginia; Not admitted to practice in DC, supervised by members of DC bar*
1299 Pennsylvania Avenue, NW, Suite 700
Washington, DC 20004-2400
Telephone: (202) 842-7800
Facsimile: (202) 842-7899

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ASCENA RETAIL GROUP, INC., *et al.*,[1] | ) | Case No. 20-33113 (KRH) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |

**INTERIM ORDER (I) AUTHORIZING THE DEBTORS TO (A) PAY PREPETITION WAGES, SALARIES, OTHER COMPENSATION, AND REIMBURSABLE EXPENSES AND (B) CONTINUE EMPLOYEE BENEFITS PROGRAMS, AND (II) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for entry of an interim order (this "Interim Order"), authorizing the Debtors to (a) pay all prepetition and postpetition obligations on account of the Employee

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at http://cases.primeclerk.com/ascena. The location of Debtor Ascena Retail Group, Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 933 MacArthur Boulevard, Mahwah, New Jersey 07430

[2] Capitalized terms used but not otherwise defined herein have the meanings given to them in the Motion.

Compensation and Benefits Programs in the ordinary course of business, and (b) continue to administer the Employee Compensation and Benefits Programs, including payment of prepetition obligations related thereto, and granting related relief, and (c) scheduling a final hearing to consider approval of the Motion on a final basis, all as more fully set forth in the Motion; and upon the First Day Declaration; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Standing Order of Reference from the United States District Court for the Eastern District of Virginia*, dated August 15, 1984; and that this Court may enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1. The Motion is granted on an interim basis as set forth herein.

2. The final hearing (the "Final Hearing") on the Motion shall be held on __________, 2020, at__:__ _.m., prevailing Eastern Time. Any objections or responses to entry of a final order on the Motion shall be filed on or before 4:00 p.m., prevailing Eastern Time on __________, 2020,

and served on the Notice Parties. In the event no objections to entry of a final order on the Motion are timely received, this Court may enter such final order without need for the Final Hearing.

3. The Debtors are authorized, but not directed, to: (a) continue and discontinue the Employee Compensation and Benefits Programs in the ordinary course of business during these chapter 11 cases and without the need for further Court approval, subject to applicable law; and (b) pay and honor prepetition amounts outstanding under or related to the Employee Compensation and Benefits Programs in the ordinary course of business; *provided* that, pending entry of the Final Order, the Debtors are not authorized to honor obligations or pay amounts pursuant to or arising under the Business Vehicle Reimbursement, Educational Reimbursements, Relocation Expenses, Performance Incentive Programs, NQDC Plan, Supplemental Retirement Plans, Paid Time Off, Non-Insider Severance Programs, or Director Compensation; *provided further* that, pending entry of the Final Order, the Debtors shall not honor any Employee Compensation and Benefits Programs obligations that exceed the priority amounts set forth in sections 507(a)(4) or 507(a)(5) of the Bankruptcy Code. For the avoidance of doubt, upon entry of this Interim Order, the Debtors are authorized, but not directed, to continue the Store Closing Bonus Program in the ordinary course and honor any obligations or pay any amounts related thereto.

4. Pursuant to section 362(d) of the Bankruptcy Code, Employees are authorized to proceed with their claims under the Workers' Compensation Program in the appropriate judicial or administrative forum and the Debtors are authorized to continue the Workers' Compensation Program and pay all prepetition amounts relating thereto in the ordinary course of business. This modification of the automatic stay pertains solely to claims under the Workers' Compensation Program.

5. Nothing herein shall be deemed to authorize the payment of any amounts which violates or implicates section 503(c) of the Bankruptcy Code; *provided* that nothing herein shall prejudice the Debtors' ability to seek approval of relief pursuant to section 503(c) of the Bankruptcy Code at a later time.

6. Nothing contained herein is intended or should be construed to create an administrative priority claim on account of any obligations owed under any Employee Compensation and Benefits Programs.

7. The banks and financial institutions on which checks were drawn or electronic payment requests made in payment of the prepetition obligations approved herein are authorized to receive, process, honor, and pay all such checks and electronic payment requests when presented for payment, and all such banks and financial institutions are authorized to rely on the Debtors' designation of any particular check or electronic payment request as approved by this Interim Order, without any duty of further inquiry and without liability for following the Debtors' instructions.

8. The Debtors are authorized to pay outstanding balances, charges, and fees due with respect to the Corporate Credit Cards and to continue to maintain cash collateral in support of the obligations thereunder. Bank of America, N.A., is authorized to make advances under the Corporate Credit Cards from time to time to the Debtors, with a maximum exposure at any time up to $750,000. Bank of America, N.A., may rely on the representations of the Debtors with respect to their use of the Corporate Credit Card, and Bank of America, N.A. shall not have any liability to any party for relying on such representations by the Debtors as provided for herein.

9. Notwithstanding the relief granted in this Interim Order and any actions taken pursuant to such relief, nothing in this Interim Order shall be deemed: (a) an admission as to the

amount of, basis for, or validity of any prepetition claim against a Debtor entity; (b) a waiver of the Debtors' or any other party in interest's right to dispute any prepetition claim on any grounds; (c) a promise or requirement to pay any prepetition claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Interim Order or the Motion; (e) a request or authorization to assume any prepetition agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission to the validity, priority, enforceability, or perfection of any lien on, security interest in, or encumbrance on property of the Debtors' estates; or (g) a waiver of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable law. Any payment made pursuant to this Interim Order is not intended and should not be construed as an admission as the validity of any particular claim or a waiver of the Debtors' rights to subsequently dispute such claim.

10. The Debtors are authorized to issue postpetition checks, or to effect postpetition fund transfer requests, in replacement of any checks or fund transfer requests that are dishonored as a consequence of these chapter 11 cases with respect to prepetition amounts owed in connection with the relief granted herein.

11. Notwithstanding anything to the contrary in this Interim Order, any payment made or action taken by any of the Debtors pursuant to the authority granted in this Interim Order must be in compliance with, and shall be subject to: (i) any interim or final order approving the Debtors' use of cash collateral and/or any postpetition financing facility (in either case, the "Cash Collateral Order"); (ii) the documentation in respect of any such use of cash collateral and/or postpetition financing; and (iii) the budget governing any such use of cash collateral and/or postpetition financing. To the extent there is any inconsistency between the term of the Cash Collateral Order and this Interim Order, the terms of the Cash Collateral Order shall control.

12. The contents of the Motion satisfy the requirements of Bankruptcy Rule 6003(b).

13. The requirement under Local Bankruptcy Rule 9013-1(G) to file a memorandum of law in connection with the Motion is waived.

14. Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and the requirements of Bankruptcy Rule 6004(a) and the Local Bankruptcy Rules are satisfied by such notice.

15. Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Interim Order are immediately effective and enforceable upon its entry.

16. The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Interim Order.

17. This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Interim Order.

Dated: ___________
Richmond, Virginia

_______________________________________
United States Bankruptcy Judge

WE ASK FOR THIS:

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C.
Steven N. Serajeddini, P.C. (*pro hac vice* pending)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
-and-
John R. Luze (*pro hac vice* pending)
300 North LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

/s/ *Cullen D. Speckhart*
**COOLEY LLP**
Cullen D. Speckhart (VSB 79096)
*Admitted to practice in New York, Virginia, Missouri and Texas; Not admitted to practice in DC, supervised by members of DC bar*
Olya Antle (VSB 83153)
*Admitted to practice in Virginia; Not admitted to practice in DC, supervised by members of DC bar*
1299 Pennsylvania Avenue, NW, Suite 700
Washington, DC 20004-2400
Telephone: (202) 842-7800
Facsimile: (202) 842-7899

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

**CERTIFICATION OF ENDORSEMENT**
**UNDER LOCAL BANKRUPTCY RULE 9022-1(C)**

Pursuant to Local Bankruptcy Rule 9022-1(C), I hereby certify that the foregoing proposed order has been endorsed by or served upon all necessary parties.

/s/ *Cullen D. Speckhart*

# **Exhibit B**

**Proposed Final Order**

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C.
Steven N. Serajeddini, P.C. (*pro hac vice* pending)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

-and-

John R. Luze (*pro hac vice* pending)
300 North LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

**COOLEY LLP**
Cullen D. Speckhart (VSB 79096)
*Admitted to practice in New York, Virginia, Missouri and Texas; Not admitted to practice in DC, supervised by members of DC bar*
Olya Antle (VSB 83153)
*Admitted to practice in Virginia; Not admitted to practice in DC, supervised by members of DC bar*
1299 Pennsylvania Avenue, NW, Suite 700
Washington, DC 20004-2400
Telephone: (202) 842-7800
Facsimile: (202) 842-7899

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| ASCENA RETAIL GROUP, INC., *et al.*,[1] | ) | Case No. 20-33113 (KRH) |
| Debtors. | ) | (Joint Administration Requested) |

**FINAL ORDER (I) AUTHORIZING THE DEBTORS TO (A) PAY PREPETITION WAGES, SALARIES, OTHER COMPENSATION, AND REIMBURSABLE EXPENSES AND (B) CONTINUE EMPLOYEE BENEFITS PROGRAMS, AND (II) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for entry of a final order (this "Final Order"), authorizing the Debtors to (a) pay all prepetition and postpetition obligations on account of the Employee Compensation

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at http://cases.primeclerk.com/ascena. The location of Debtor Ascena Retail Group, Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 933 MacArthur Boulevard, Mahwah, New Jersey 07430

[2] Capitalized terms used but not otherwise defined herein have the meanings given to them in the Motion.

and Benefits Programs in the ordinary course of business, and (b) continue to administer the Employee Compensation and Benefits Programs, including payment of prepetition obligations related thereto, and granting related relief, all as more fully set forth in the Motion; and upon the First Day Declaration; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Standing Order of Reference from the United States District Court for the Eastern District of Virginia*, dated August 15, 1984; and that this Court may enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1. The Motion is granted on a final basis as set forth herein.

2. The Debtors are authorized, but not directed, to: (a) continue and/or modify, change, or discontinue the Employee Compensation and Benefits Programs in the ordinary course of business during these chapter 11 cases and without the need for further Court approval, subject to applicable law; and (b) pay and honor prepetition amounts outstanding under or related to the Employee Compensation and Benefits Programs in the ordinary course of business.

3. Pursuant to section 362(d) of the Bankruptcy Code, Employees are authorized to proceed with their claims under the Workers' Compensation Program in the appropriate judicial or administrative forum and the Debtors are authorized to continue the Workers' Compensation Program and pay all prepetition amounts relating thereto in the ordinary course of business. This modification of the automatic stay pertains solely to claims under the Workers' Compensation Program.

4. Nothing herein shall be deemed to authorize the payment of any amounts which violates or implicates section 503(c) of the Bankruptcy Code; *provided* that nothing herein shall prejudice the Debtors' ability to seek approval of relief pursuant to section 503(c) of the Bankruptcy Code at a later time.

5. Nothing contained herein is intended or should be construed to create an administrative priority claim on account of any obligations owed under any Employee Compensation and Benefits Program.

6. The banks and financial institutions on which checks were drawn or electronic payment requests made in payment of the prepetition obligations approved herein are authorized to receive, process, honor, and pay all such checks and electronic payment requests when presented for payment, and all such banks and financial institutions are authorized to rely on the Debtors' designation of any particular check or electronic payment request as approved by this Final Order without any duty of further inquiry and without liability for following the Debtors' instructions.

7. The Debtors are authorized to pay outstanding balances, charges and fees due with respect to the Corporate Credit Cards and to continue to maintain cash collateral in support of the obligations thereunder. Bank of America, N.A., is authorized to make advances under the Corporate Credit Cards from time to time to the Debtors, with a maximum exposure at any time

up to $750,000. Bank of America, N.A., may rely on the representations of the Debtors with respect to their use of the Corporate Credit Card, and Bank of America, N.A. shall not have any liability to any party for relying on such representations by the Debtors as provided for herein.

8. Notwithstanding anything contained in the Motion or this Final Order, any payment to be made, and any relief or authorization granted herein, shall be subject to the terms and conditions contained in any interim or final orders entered by this Court authorizing the Debtors to obtain debtor-in-possession financing and/or authorizing the use of cash collateral (each such order, a "DIP Order"), the documentation in respect of any such debtor-in-possession financing or use of cash collateral, and any budget in connection with any such debtor-in-possession financing and/or use of cash collateral. To the extent there is any inconsistency between the terms of the DIP Order and any action taken or proposed to be taken hereunder, the terms of the DIP Order shall control.

9. Notwithstanding the relief granted in this Final Order and any actions taken pursuant to such relief, nothing in this Final Order shall be deemed: (a) an admission as to the validity of any prepetition claim against a Debtor entity; (b) a waiver of the Debtors' or any other party in interest's right to dispute any prepetition claim on any grounds; (c) a promise or requirement to pay any prepetition claim on any grounds; (d) an implication or admission that any particular claim is of a type specified or defined in this Final Order or the Motion; (e) a request or authorization to assume any prepetition agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission to the validity, priority, enforceability, or perfection of any lien on, security interest in, or encumbrance on property of the Debtors' estates; or (g) a waiver of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable law. Any payment made pursuant to this Final Order is not intended and should not be

construed as an admission as the validity of any particular claim or a waiver of the Debtors' rights to subsequently dispute such claim.

10. The Debtors are authorized to issue postpetition checks, or to effect postpetition fund transfer requests, in replacement of any checks or fund transfer requests that are dishonored as a consequence of these chapter 11 cases with respect to prepetition amounts owed in connection with the relief granted herein.

11. Notwithstanding anything to the contrary in this Final Order, any payment made or action taken by any of the Debtors pursuant to the authority granted in this Final Order must be in compliance with, and shall be subject to: (i) any interim or final order approving the Debtors' use of cash collateral and/or any postpetition financing facility (in either case, the "Cash Collateral Order"); (ii) the documentation in respect of any such use of cash collateral and/or postpetition financing; and (iii) the budget governing any such use of cash collateral and/or postpetition financing. To the extent there is any inconsistency between the term of the Cash Collateral Order and this Final Order, the terms of the Cash Collateral Order shall control.

12. The contents of the Motion satisfy the requirements of Bankruptcy Rule 6003(b).

13. The requirement under Local Bankruptcy Rule 9013-1(G) to file a memorandum of law in connection with the Motion is waived.

14. Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and the requirements of Bankruptcy Rule 6004(a) and the Local Bankruptcy Rules are satisfied by such notice.

15. Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Final Order are immediately effective and enforceable upon its entry.

16. The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Final Order.

17. This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Final Order.

Dated: __________
Richmond, Virginia

_________________________________
United States Bankruptcy Judge

WE ASK FOR THIS:

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C.
Steven N. Serajeddini, P.C. (*pro hac vice* pending)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
-and-
John R. Luze (*pro hac vice* pending)
300 North LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

/s/ *Cullen D. Speckhart*
**COOLEY LLP**
Cullen D. Speckhart (VSB 79096)
*Admitted to practice in New York, Virginia, Missouri and Texas; Not admitted to practice in DC, supervised by members of DC bar*
Olya Antle (VSB 83153)
*Admitted to practice in Virginia; Not admitted to practice in DC, supervised by members of DC bar*
1299 Pennsylvania Avenue, NW, Suite 700
Washington, DC 20004-2400
Telephone: (202) 842-7800
Facsimile: (202) 842-7899

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

**CERTIFICATION OF ENDORSEMENT**
**UNDER LOCAL BANKRUPTCY RULE 9022-1(C)**

Pursuant to Local Bankruptcy Rule 9022-1(C), I hereby certify that the foregoing proposed order has been endorsed by or served upon all necessary parties.

/s/ *Cullen D. Speckhart*